## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) JURY TRIAL DEMANDED |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| MELISSA A. DEUERLING, | ) Civil 2:14cv00642-ANB |
| | ) |
| Defendant, Counterclaimant, | ) |
| and Third Party Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| G.C. SERVICES, L.P., | ) |
| DIVERSIFIED COLLECTION SERVICES INC., | ) |
| ALLIED INTERSTATE INC., | ) |
| WINDHAM PROFESSIONALS INC., | ) |
| PROGRESSIVE FINANCIAL SERVICES INC., | ) |
| CONTINENTAL SERVICE GROUP INC. a/k/a | ) |
| CONSERVE, EDUCATION MANAGEMENT | ) |
| CORPORATION, EDUCATION | ) |
| MANAGEMENT LLC, EDUCATION | ) |
| MANAGEMENT HOLDINGS LLC; THE | ) |
| ART INSTITUTE OF PITTSBURGH, | ) |
| JPMORGAN CHASE N.A., successor to | ) |
| INB NATIONAL BANK, UNITED STATES | ) |
| DEPARTMENT OF JUSTICE, UNITED | ) |
| DEPARTMENT OF THE TREASURY, | ) |
| UNITED STATES DEPARTMENT OF | ) |
| EDUCATION, THOMAS I. PULCO, | ) |
| and KML LAW GROUP P.C., | ) |
| | ) |
| Third-party Defendants. | ) |

### Amended Counterclaim/Cross Claim and Third Party Complaint[1]

AND NOW COMES the Defendant and Third Party Plaintiff, Melissa Deuerling ("Deuerling"),

who, for her Third Party Complaint alleges and avers:

### background

1. The Defendant's Answer and Counterclaim are incorporated by reference as if fully set forth

---

1 This is Defendant's first Amended Cross Claim and Counterclaim.  In the Court's Order denying the motion to dismiss the counterclaim as moot, it referenced an amended pleading.  However, the counterclaim/cross claim was against the United States and the Third Party Complaint was against third party agencies of the United States.

again.

2.  Third-party defendants Education Management Corporation, Education Management holdings LLC, Education Management LLC, the Art Institute of Pittsburgh, and INB National Bank (now JPMorgan Chase N.A.) created a fraudulent scheme in the 1980s to induce students into signing up for courses via federally guaranteed student loans while misrepresenting the potential for the students to ultimately have a career in the chosen field.

3.  Third-party defendants Education Management Corporation, Education Management holdings LLC, Education Management LLC, the Art Institute of Pittsburgh, and INB National Bank (now JPMorgan Chase N.A.) induced Deuerling to accept student loans while omitting and misrepresenting information that would have alerted her to the fact that hardly any person graduating from the courses maintains a successful career in the chosen fields.

4.   Under Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. §§ 1070 et seq., Congress established various student loan and grant programs, including but not limited to the Federal Pell Grant Program ("Pell"), the Federal Family Education Loan Program ("FFELP"), and the Federal Direct Loan Program ("FDLP") (collectively "Title IV funding") in order to financially assist eligible students in obtaining a post-secondary education.

5.   Although the mechanism by which Title IV funding is disbursed to eligible students under the Title IV, HEA programs varies, each Title IV, HEA program requires compliance with specific conditions as a prerequisite to obtaining federal funds.

6.  In order to become eligible to receive Title IV funding under programs such as Pell, FFELP, or FDLP, or to have its students receive Title IV funding, a post-secondary educational institution must first enter into a program participation agreement ("PPA") with the Department of Education. 20 U.S.C. § 1094(a); 34 C.F.R. §668.14.

7.  Each PPA expressly conditions a school's initial and continuing eligibility to receive funds under Title IV, HEA programs on compliance with specific statutory requirements, including 20

U.S.C. § 1094 and 34 C.F.R. § 668.14.

8. Section 487(a)(20) of Title IV of the HEA, 20 U.S.C. § 1094(a)(20) explicitly requires that schools: "Will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance. . . ." 20 U.S.C. § 1094(a)(20) ("Incentive Compensation Ban").

9. Title IV of the HEA expressly conditions the initial and continuing eligibility of schools to obtain Title IV funding on the requirement that the schools comply with the Incentive Compensation Ban.

10. The HEA's Incentive Compensation Ban is also reiterated in the federal regulations which specify the requirements to which schools must expressly agree in PPAs. 34 C.F.R. § 668.14(b) (22) ("Incentive Compensation Regulations").

11. Congress enacted the prohibition against paying commissions, bonuses, or other incentive payments based on success in recruiting students because such payments were associated with high loan default rates, which in turn resulted in a significant drain on program funds where the government acts as a loan guarantor.

12. When Congress amended the HEA in 1992 to prohibit schools from paying these incentives, it did so based on evidence of serious program abuses, including incentive compensation. S. Rep. No. 58, 102d Cong., 1 Sess., at 8 st (1991)("Abuses in Federal Student Aid Programs")(noting testimony "that contests were held whereby sales representatives earned incentive awards for enrolling the highest number of students for a given period"); H.R. Rep. No. 447, 102d Cong., 2d Sess., at 10, reprinted in 1992 U.S.C.C.A.N. 334, 343 (noting new provisions that "include prohibiting the use of commissioned sales persons and recruiters").

13. After a school becomes eligible to receive Title IV funding by entering into a PPA, claims for payment of those funds can be made in various ways. Under Pell and FDLP, for example,

students submit requests for funding directly to the Department of Education, or to the Department of Education with the assistance of schools. Under the FFELP, students and schools jointly submit requests to private lenders for loans that are then guaranteed by state agencies and are, in turn, insured by the Department of Education and paid in the event of a default.

14. With respect to all Title IV, HEA programs, the disbursement of federal funds rests on required statements of eligibility made by schools that are necessary for requests for payment to be considered.

15. For all Title IV, HEA programs, students who are interested in receiving federal student aid must complete a "Free Application for Federal Student Aid," known as a "FAFSA."

16. Under the Pell Grant program, which provides federal funds to assist postsecondary school students in financial need, 20 U.S.C. § 1070a; 34 C.F.R. § 690.1, the student initiates the process by submitting a FAFSA to the Department of Education to have her expected family contribution ("EFC") calculated in order to receive an accurate amount of Pell funds. 34 C.F.R. § 690.12(a).

17. The student either sends the FAFSA directly to the Department of Education or provides it to a school for the school to transmit it to the Department of Education on the student's behalf. 34 C.F.R. § 690.12(b).

18. The Department of Education sends the student's application information and EFC to the student on a Student Aid Report ("SAR") and sends each school the student has designated an Institutional Student Information Record ("ISIR") for that student. 34 C.F.R. § 690.13.

19. The school uses the above-described information, including the EFC, to calculate the student's eligibility for all aid and to assemble a "financial aid award package" for the student borrower.

20. The financial aid package may include Pell Grants, FDLP Direct Loans, or CampusBased Aid (which in turn includes Federal Supplemental Educational Opportunity Grants, Federal Work-Study, and Federal Perkins Loans), as well as other scholarships or aid for which the student

may be eligible.

21. The student can accept all or part of the financial aid award package.

22. If the student accepts a Pell Grant, an FDLP Direct Loan (for which the Department of Education is both lender and guarantor), or both a Pell Grant and a Direct Loan, the school creates an electronic "origination" record that the school submits to a Department of Education computerized database called COD. The origination record includes student demographic data, the award or payment period, the award amount, and disbursement dates and amounts. The COD data base, in turn, links the information in the origination record to another Department of Education database, called CPS, which compares the information in the origination record to the information on the student's SAR and ISIR.

23. Provided that the information submitted by the school is consistent with the information possessed by the Department of Education, the Department of Education makes funds available for the school to electronically draw down from a computerized system known as "G5."

24. Schools must electronically certify in G5 prior to drawing down the funds that "by processing this payment request . . . the funds are being expended within three business days of receipt for the purpose and condition[s] of the [Program Participation] agreement."

25. In addition to the Pell Grants themselves, the Department of Education also pays to the school an annual administrative cost allowance of $5.00 for each student who receives a Pell Grant, to be used to pay the costs of administering the Pell Grant and other Title IV, HEA federal student aid programs. 20 U.S.C. § 1096; 34 C.F.R. § 690.10.

26. Under the FFELP, which includes subsidized and un-subsidized Stafford Loans, a guaranty agency makes the eventual claim for payment by the United States. No new loans were made under FFELP after July 1, 2010. Prior to that date, the school and student submitted an application to a private lender for a loan on behalf of the student. If a student defaults in repaying a loan under the FFELP program, a state or private guaranty agency reimburses the

lender or the subsequent holder of the loan for the outstanding balance and takes assignment of the loan for collection action. 34 C.F.R.§ 682.401(b)(14). If the guaranty agency is unable to collect from the borrower, the Department of Education reimburses the guaranty agency for the loss it incurred in honoring the defaulted claims, 20 U.S.C. § 1078(c)(1)(A), and the Department of Education may, in its discretion, take assignment of the loan. 20 U.S.C. § 1078(c)(8). In this way, the government is ultimately called upon to satisfy claims for payment.

27.   In order to participate in the FFELP or any other Title IV loan, as opposed to grant, program, a student completes a Master Promissory Note ("MPN") and submits the MPN to the educational institution. The institution, in turn, completes a "School Certification," in which it certifies the accuracy of the information it provided to the Department of Education and the student's eligibility for the loan. 34 C.F.R. § 682.102.

28.   While the MPN itself is valid for ten years, the educational institution determines the student's ongoing eligibility for aid and completes the School Certification annually.

29.   Under FFELP, the educational institution then submits the MPN to the lender.

30.   Upon approval by the lender, the lender obtains a loan guarantee from a guarantee agency. 34 C.F.R. § 682.102.

31.   The loan is made in reliance upon the accuracy of the information provided by the educational institution.

32.   The lender transfers the FFELP funds directly into the educational institution's account. Upon receiving the FFELP funds, the educational institution credits a student's account for education-related expenses, such as tuition, fees, books, and supplies.

33.   For subsidized Stafford loans, the government pays the interest on the student's behalf during the time the student is enrolled in school on at least a half-time basis, and during the student's grace period before repayment commences. 34 C.F.R. § 682.102(d)(2).

34.   In the event of default on the loan, the Department pays to the guarantee agency all or part of

the unpaid principal and accrued interest, as well as a variety of administrative costs. 34 C.F.R.
§ 682.404.

35. EDMC knowingly made false statements, certifications, and claims regarding compliance with
the Incentive Compensation Ban in order to become and remain eligible to receive Title IV
funding. EDMC's statements were false when made, and caused the Department of Education
to pay various claims under Title IV, HEA programs.

36. EDMC signs and submits PPAs to the Department of Education on behalf of all of EDMC's
educational institutions throughout the United States.

37. EDMC made certifications in PPAs and also made, or caused to be made, additional
certifications as part of its annual compliance audits and as part of the student financial aid
process, including but not limited to Required Management Assertions, G5 Certifications,
Master Promissory Notes, and their accompanying School Certifications.

38. EDMC submits a variety of claims to the government for Title IV funding that it knows to be
false based upon its non-compliance with the Incentive Compensation Ban.

39. During the 1990s, and the material times of Deuerling's student loans, EDMC and the Art
Institute of Pittsburgh received over $1,000,000 in Title IV funding for students enrolled in
EDMC institutions.

40. As a required part of its annual compliance audits, EDMC certifies that it complies with the
requirements for eligibility to participate in Title IV programs, including the Incentive
Compensation Ban.

41. As a required part of the student financial aid process, and in order to receive Title IV, HEA
funds for students enrolled at its institutions, EDMC certifies that it complies with the
requirements for eligibility in Title IV, HEA programs, including the Incentive Compensation
Ban.

42. EDMC created a "boiler room" style sales culture and has made recruiting and enrolling new

students the sole focus of its compensation system. Moreover, EDMC's compensation system and compensation practices result in the payment of "commission[s], bonus[es], or other incentive payment [s]" and thus violate the Incentive Compensation Ban set forth in Title IV of the HEA. Through its compensation system and compensation practices, the representations and certifications it makes to the federal government in its PPAs, in connection with annual compliance audits, and in other documents, EDMC knowingly violates Title IV of the HEA's Incentive Compensation Ban and Regulatory Safe Harbor, and its accompanying and implementing regulations.

43. EDMC's ADAs serve as EDMC's "in-school recruiters."

44. ADAs are responsible for recruiting applicants for admission to EDMC schools, including securing and managing new student inquiries, achieving enrollment and start rate goals, and participating in recruitment and enrollment activities. An ADA is in frequent contact with potential students during the entire recruitment and enrollment process.

45. The ADA's name is on all of the student's application and financial aid documents to ensure that the ADA receives credit for enrolling the student.

46. EDMC's compensation system for admissions personnel is called the Admissions Performance Plan.

47. EDMC provides all of its ADAs with a copy of a document that explains the Admissions Performance Plan.

48. More recent versions of this document are titled, for example,"Admissions Performance Plan, Information for Assistant and Associate Directors of Admission."

49. In the Guide to the Admissions Performance Plan, EDMC explains to ADAs that their compensation is based on "your manager's evaluation of your performance against quality factors over the previous six months, combined with the number and types of new students you recruited over the past 12 months."

50. "The number of new students you recruited over the previous 12 months is converted into points, and the point total ["New Student Points"] determines the salary range. Your salary within the range is determined by your manager's evaluation of performance against quality factors, as described above."

51. EDMC indicates in the Guide to Admissions Performance Plan that ADAs will receive performance evaluations twice per year, in May/June and November/December, and that ADAs' salaries will be re-calculated to take effect July 1 and January 1, based on the results of the ADA's evaluation. EDMC's Guide to the Admissions Performance Plan includes EDMC's "ADA/Associate Annualized Salary Chart," which is known as "the Matrix" ("Matrix").

52. The Matrix is the centerpiece of EDMC's compensation system and is featured in each iteration of EDMC's Admissions Performance Plan.

53. The Matrix sets forth the number of "New Student Points" that an ADA must attain in order to achieve a particular compensation level. New Student Points are calculated based on the number of students the ADA recruits. The Matrix lists compensation schedules, with a compensation level corresponding to the "New Student Point Range" an ADA achieves, i.e., based on the number of students recruited. Pursuant to the Matrix as designed, "quality factor" ratings, such as "needs improvement," "meets  expectations," "highly effective," and "outstanding," purport to adjust the employee's compensation within the level set by the number of students recruited.

54. Per EDMC's Guide to the Admissions Performance Plan, newly hired ADAs are subject to a six-month introductory period, at the end of which they are ostensibly evaluated only on quality factors, and not on the basis of number of students recruited, and their compensation is adjusted based on their quality factors.

55. However, at their second review, twelve months after hire, ADAs are ostensibly reviewed based on quality factors for the past six months and New Student Points for their entire past twelve

month employment with EDMC. At the time of the twelve month review, the employee's compensation is set at the greater of the "quality points only" compensation or based on New Student Points and quality factor points ("Matrix compensation").

56. To the extent that the employee has amassed sufficient New Student Points in her first twelve months at EDMC to result in higher compensation by including the New Student Points than by calculating the compensation based on quality points alone, the employee has successfully "gone on the Matrix." The new employee's third review and associated compensation change, which is scheduled to take place 18 months after hire, occurs according to the terms of the Matrix, i.e. the new student point range is necessarily taken into account in setting the employee's compensation level.

57. In addition to appearing in the Guide to Admissions Performance Plan that EDMC distributes to ADAs, the Matrix is also presented in a PowerPoint presentation to prospective EDMC employees during their interviews, and to new EDMC employees as part of their initial training and orientation sessions.

58. During employees' initial training, they are told that "the number of points based on new students recruited for the prior twelve months determines a person's salary range and 'quality factors' determine the person's position within the salary range."

59. EDMC's Admissions Department openly admits that compensation is tied to enrollment numbers.

60. Employees are told that their compensation would depend on the number of students enrolled and promised that her compensation would increase within the first six (6) months of employment if they met enrollment goals.

61. Using the Matrix, an ADA is able to determine the precise effect that each new student enrollment will have on his or her compensation.

62. From day one of their employment with EDMC, ADAs are pressured to, and desire to, "go on

the Matrix" in order to receive the associated higher levels of compensation.

63. EDMC provides all of its Directors of Admissions with a document that provides an overview of the compensation system for admissions personnel.

64. The Director of Admissions for each EDMC school serves as the primary recruiting and marketing manager for that EDMC school, and manages or oversees the managers of all recruiting functions, including Associate and Assistant Directors of Admissions.

65. The Manager Guidelines document that each Director of Admissions receives reinforces the instructions that ADAs receive about how the Matrix operates. The Manager Guidelines specify that "[t]he fundamentals of the Admissions Performance Plan work the same way for all participants, to ensure that Associate and ADA compensation is standardized and rewards performance against specific qualitative and quantitative objectives."

66. The Manager Guidelines further specify that the salary range for each ADA is determined as follows: "[t]he new students recruited over the previous 12 months are converted into points (based on the characteristics of the new student), and the point total determines a salary range for a participant. The salary within the range is determined by the manager's evaluation of performance against quality factors."

67. EDMC Determines Compensation Based on New Student Enrollments   EDMC's emphasis of, and reliance on, new student enrollment as the sole basis upon which it determines an ADA's compensation is demonstrated by the emphasis EDMC places on training its ADAs to "sell" enrollments.

68. In order to boost its student enrollment numbers, EDMC urges ADAs to enroll students before thoroughly reviewing their transcripts to determine their academic qualifications to attend the institution or online program. EDMC also regularly instructs ADAs to enroll applicants regardless of their qualifications, including applicants who are unable to write coherently, applicants who appear to ADAs to be under the influence of drugs, and applicants for EDMC's

online program who do not own computers. Although EDMC publishes academic requirements for incoming students, EDMC accepts potential students who complete an application and submit a 150-word essay. EDMC approves all student applications regardless of the applicant's high school grade point average or the quality of the applicant's written essay, although some deficient students are required to take extra credits.

69. EDMC instructs ADAs that, when making a recruitment pitch to a student, the ADA should inform the potential student that EDMC schools have very high career placement percentages and that the Career Services Office will contact the student six (6) weeks prior to graduation and will set up interviews for the student with prospective employers. However, in actuality, students themselves must initiate the process to receive the benefits of the Career Services Office. In addition, students may use the Career Services Office for a limited time after graduation, despite the fact that many ADAs tell students that they will have lifetime access to the Career Services Office.

70. EDMC instructs ADAs to secure enrollments by employing a recruitment tactic called "finding the pain." "Finding the pain" means locating a prospective student's vulnerabilities and exploiting those vulnerabilities to persuade the student to enroll in an EDMC program, even after the student has expressed a desire not to enroll. EDMC trains ADAs that examples of "the pain" include a hypothetical student's desire to earn enough money to move her kids out of a dangerous neighborhood, or her desire to make her father proud.

71. An ADA will not receive credit for the student's enrollment, and corresponding "New Student Points," which are used to calculate the ADA's compensation on the Matrix, until a student confirms enrollment in a class, and thus becomes financially liable to EDMC.

72. Accordingly, ADAs pressure prospective students to enroll in EDMC schools so that the ADAs can receive New Student Points on the Matrix corresponding compensation increases.

73. Because an ADA does not get credit for enrolling a student or receive New Student Points until

that student confirms his or her enrollment, ADAs remain in contact with the student via telephone calls and emails until the student confirms enrollment. The ADA continually urges the student to confirm enrollment in a class, even if a student expresses doubts about doing so and even if the student appears to be unqualified.

74. After a student confirms enrollment, whether the student succeeds or fails in the class is of no concern to the ADA because, upon enrollment confirmation, the ADA earns the New Student Points towards the ADA's compensation increase.

75. EDMC's linking of New Student Points for the ADA to a student's enrollment confirmation leads to the enrollment of unqualified and uninformed students, many of whom fail to complete the EDMC programs in which they enroll.

76. During the student enrollment process, ADAs are also in constant contact with EDMC Financial Aid Officers. ADAs are responsible for making sure that students complete all of their loan applications and that students submit those applications to the EDMC school and the federal government.

77. The ADA seeks to ensure that his or her name will be on all of the student's applications and financial aid documents in order for the ADA to receive credit for enrolling the student

78. Once all of the student's applications are complete, the ADA forwards them to the assigned EDMC Financial Aid Officer.

79. After a student's financial aid forms are complete, an EDMC Financial Aid Officer will calculate the student's financial aid plan based on a Department of Education formula, and inform the student.

80. The student can accept or reject the financial aid plan. If a student rejects a financial aid plan, often because the student does not qualify for enough financial aid to cover the entire amount of tuition, it is the ADA's job to convince the student to accept the financial aid package and enroll in an EDMC school.

81. ADAs are instructed to use a number of tactics to convince students to enroll in an EDMC school. For example, ADAs may convince a student to change his or her status from full-time to part-time so that the student's financial aid package will cover the tuition.

82. A majority of students will change their status to part-time, because after doing so, they usually receive a refund from financial aid, in the form of a check from EDMC for the amount of financial aid that the student has not used for that particular academic quarter. However, most ADAs do not inform the students that the refunded amount of financial aid is still part of the student loan and that it will eventually have to be repaid.

83. Once a student accepts his or her financial plan, the EDMC Financial Aid Officer certifies the student's loans and grants, which are then submitted to the Department of Education for approval and payment.

84. EDMC's emphasis of, and reliance on, new student enrollment as the sole basis on upon which it determines an ADA's compensation is also demonstrated by the way it tracks ADAs' success in obtaining student enrollments.

85. EDMC continually measures each ADA against his or her "Student Start Plan."

86. An ADA's Student Start Plan sets forth the number of students an ADA is expected to enroll for the upcoming quarter, in the case of some EDMC ground schools, or upcoming session, for online programs and some EDMC ground schools. Two examples of Student Start Plans.

87. The Student Start Plan for each ADA is provided to the ADA's supervisor by higher level EDMC corporate employees.

88. Whether an ADA's compensation is governed by the Matrix, or in EDMC's words, whether an ADA is "on the Matrix," is a function of whether or not the ADA meets the required enrollment numbers in her Student Start Plan.

89. Based on the ADA's Student Start Plan, the ADA's supervisor formulates a "Plan to Make Plan" that shows the ADA what he or she needs to do to achieve the number of student enrollments

required by his or her Student Start Plan for the upcoming quarter or session.

90. To encourage ADAs to meet their enrollment goals, ADAs' supervisors also ask ADAs to imagine their "dream car" or other financial goal, or to name the overall compensation they hope to earn. EDMC then uses documents such as "Financial Planning 101" worksheets, to show each ADA exactly how many New Student Points she needs to make a particular amount of compensation.

91. For example, the Financial Planning 101 document breaks down the specific number of applications, interviews, and appointments per week that an ADA must accomplish to reach the number of New Student Points necessary to achieve her desired compensation.

92. EDMC closely tracks and maintains data regarding the actual number of student enrollments that the ADA obtained for previous quarters and sessions, compared to the number of enrollments the ADA was expected to achieve according to her Student Start Plan.

93. Quality factors are not discussed or included in an ADA's Student Start Plan, Plan to Make Plan, or documents EDMC uses to track ADAs' performance against their Student Start Plans. To the contrary, the Student Start Plan, Plan to Make Plan, and associated tracking documents focus entirely on the number of students the ADA enrolls and only measure quantitative factors.

94. EDMC managers who supervise ADAs use Student Start Plan documents, and other similar documents, as part of each ADA's review every six months, and to provide regular informal feedback to ADAs.

95. Typically, ADAs are told at the end of their reviews exactly how many student enrollments they need to procure during the next six-month review period in order to be on track to reach their identified financial goals. ADAs are not given any similar proddingor incentivizing with respect to any "quality factors."

96. EDMC presents an ADA's ability to reach her financial goals as solely a matter of procuring an identified number of student enrollments.

97. EDMC's "quality factors" have no real impact on the manner in which EDMC's compensation system is implemented.

98. EDMC meticulously tracks each ADA's student enrollment activities on a daily, weekly, monthly, quarterly, and annual basis. Each ADA's enrollment activity is then included in the reports, which are widely disseminated within EDMC.

99. The reports contain only quantitative information, and focus on the student applications and enrollments that ADAs procure. These reports, which EDMC uses to manage, evaluate, and compensate its ADAs, do not contain any information regarding qualitative factors.

100. In addition to compensation, EDMC provides commissions, bonuses, and other incentive payments in the form of awards based solely on success in obtaining student enrollments.

101. EDMC rewards the top 10% of EDMC admissions personnel, based on number of new student enrollments achieved during a given year, with an all-expenses paid "President's Club" trip to a desirable location such as Puerto Vallarta or Cancun, Mexico, or Las Vegas, Nevada.

102. EDMC employees who become members of the President's Club may bring a family member or significant other on the trip at no cost to the EDMC employee.

103. The only criterion that EDMC considers for membership in the President's Club is the number of new student enrollments an ADA achieves. During the course of the year, EDMC managers send mass emails to the ADAs on a weekly basis detailing the top performers for the previous week.

104. The weekly results and rankings of top performers include only the numbers of appointments, interviews, and student applications an ADA was able to secure during that week.

105. EDMC's conduct does not fall within the purview of, or satisfy, the Regulatory Safe Harbor for several reasons.

106. First, EDMC's compensation system, as designed and as implemented, is not eligible for

Title IV of the HEA's Regulatory Safe Harbor, because the compensation awarded under EDMC's system is not "fixed compensation" within the meaning of the Regulatory Safe Harbor. Instead of a permissible "fixed annual salary" or "fixed hourly wage," the  compensation EDMC awards under the Matrix constitutes a form of incentive payment.

107.     Under EDMC's compensation system, EDMC pre-establishes student enrollment goals and the incentive payments that it will make for admissions personnel who achieve those goals. EDMC constantly communicates those enrollment goals and resulting incentive payments to the ADAs to incentivize them to recruit more students.

108.     Using the Matrix, EDMC frequently adjusts each admissions employee's compensation, in a clear and pre-defined manner, based directly on that employee's success in obtaining student enrollments, and the employee is acutely aware of those adjustments. The fact that adjustments to an admissions employee's compensation accumulated and then paid to the employee in bi-weekly installments during the subsequent six month period does not convert the improper compensation into permissible fixed compensation.

109.     Second, EDMC's compensation system, as designed and as implemented by EDMC, adjusts compensation based solely on the number of students recruited by EDMC admissions employees, in direct violation of the Incentive Compensation Ban and accompanying Regulatory Safe Harbor.

110.     Under EDMC's compensation system as designed and as implemented, an admissions employee's initial eligibility to "go on the Matrix" is strictly based on the number of students the admissions employee can recruit. Once admissions employees are "on the Matrix," EDMC's compensation system, as designed, dictates many adjustments based solely on the number of students, in violation of the Regulatory Safe Harbor. For example, under the Matrix, if an ADA's "quality" rating stays the same for two review periods, but her compensation changes, that compensation adjustment is based solely on the number of new students recruited.

111.     Similarly, EDMC's compensation system, as implemented by EDMC, adjusts the compensation of admissions employees who are "on the Matrix" based solely on the number of students enrolled, in violation of the Regulatory Safe Harbor. In practice, EDMC's so-called "quality factors" are nothing more than window-dressing, used to camouflage a compensation system that, in reality, is driven entirely by student enrollment numbers and adjusts compensation based solely on the number of students recruited. In implementing its compensation system, EDMC creates an environment in which admissions employees understand that their compensation is determined solely by the number of students they enroll.

112.     Once an admissions employee succeeds in "going on the Matrix" by recruiting a sufficient number of students, each subsequent compensation adjustment is, in practice, made solely on the basis of the number of students that admissions employee recruits. Only after the enrollment numbers set a compensation range are quality factors even ostensibly taken into account.

113.      As a matter of course, the quality ratings were assigned to admissions employees by supervisors who were not trained on how to rate the "quality" attributes of an ADA, who paid no attention to the "quality" attributes of an ADA, and instead were trained to focus on, and did focus, solely on the ADA's success in obtaining student enrollments.

114.     Finally, the President's Club trips and other rewards, such as free meals and paid time off, that EDMC provides, constitute incentive compensation that is awarded based solely on the number of students admissions employees recruit. Accordingly, the President's Club trips and other rewards violate the Incentive Compensation Ban and the Regulatory Safe Harbor.

115.     Consequently, EDMC's compensation system, as it is designed and implemented, violates the Incentive Compensation Ban and does not qualify for protection under the Regulatory Safe Harbor.

116.     EDMC Knows that its Conduct in Implementing its Compensation System Violates the

Incentive Compensation Ban and Does Not Qualify for the Regulatory Safe Harbor,

117.     EDMC knows that its conduct in implementing its compensation system violates the

Incentive Compensation Ban and does not qualify for the Regulatory Safe Harbor.

118.     Consequently, when EDMC made statements in its PPAs and other documents such as

compliance audit Management Assertions, G5 Certifications, School Certifications, and MPNs

regarding its compliance with the Incentive Compensation Ban and eligibility for Title IV

funding, those statements were knowingly false. EDMC's compensation system, as

implemented by EDMC, is inconsistent with EDMC's statements of compliance in its PPAs,

compliance audit Management Assertions, and other documents.

119.     Every request for a federal grant, every request for a loan under FDLP, every request for

a federally guaranteed loan under FFELP, every interest payment on a subsidized Stafford Loan,

and every government payment on a loan made on behalf of a student attending an EDMC

institution constitutes a fraudulent act and misrepresentation.

**Amended Counterclaim**

**COUNT I – For Contribution and Indemnification (under the Federal Tort Claims Act) and for declaratory judgment**

120.     Paragraphs 1 through 119 are hereby incorporated by reference and are realleged as if

fully set forth again.

121.     This is not a claim under the False Claims Act.

122.     The claims of contribution and indemnification in this case are brought pursuant to the

Federal Tort Claims Act.

123.     Sovereign immunity has been waived for claims of indemnification under the Federal

Tort Claims Act.  28 USC 2674.

124.     There is no need to file an administrative remedy when the tort claim is for

indemnification or contribution raised after an action is filed against the claimant. 28 USC

2675(c) ("The provisions of this subsection shall not apply to such claims as may be asserted

under the Federal Rules of Civil Procedure by third party complaint, cross-claim, or

counterclaim").

125.     The loan in this case originated with JPMorgan Chase N.A., formerly INB National

Bank.

126.     The loans were guaranteed by the United States.

127.     The United States brought suit against Deuerling's school pursuant to the False Claims

Act to recover the amount provided in guaranteed student loans. *See*, *e.g., United States v.*

*Education Management*, 07cv461 (WDPA).

128.     In the event that the United States recovers in that case, the United States will be

estopped from collecting the student loans from the borrowers as the money would have been

returned by the educational institution.

129.     This effectively creates a joint-tortfeasor situation where the United States must

indemnify Deuerling as to these amounts.

130.     Or, to the extent the United States collected the funds from the school, the United States

must return any amounts paid by Deuerling under a theory of contribution.

131.     Alternatively, without relying on indemnification or compensation, Deuerling would be

entitled to a declaratory judgment that any amounts returned to the United States by the school

would offset any amount due it.

WHEREFORE, to the extent the United States as assignee for INB National Bank (JPMorgan

Chase N.A.) obtains judgment against Deuerling, and the United States recovers any funds from the

educational institution in question, she is entitled to judgment in the same amount from the United

States.

### COUNT II – Violations of the Fair Debt Collection Practices Act

132.     Paragraphs 1 through 131 are hereby incorporated by reference and realleged as if fully

set forth again.

133.     This Court maintains jurisdiction over this case pursuant to the Fair Debt Collection

Practices Act and 28 USC 1346 as Deurling limits her potential recovery to $10,000.

134.     The United States acted in the capacity as a debt collector with respect to its collection

activities as assignee of JPMorgan Chase National Association formerly INB National Bank.

The United States, indeed, acted solely in a statutory position to collect debts originating with

other creditors, in this case INB National Bank.

135.     The United States sent several communications to Deuerling attempting to collect a

consumer debt.

136.     The United States did not include the required notices that it was a debt collector, that

the receiver of the communication maintained a right to dispute the debt, or that the receiver of

the communications could request the name and address of the original creditor.

137.     The actions of the United States, acting as a debt collector, violated the Fair Debt

Collection Practices Act.

138.     Deuerling was damaged as a result of the violations of the Fair Debt Collection Practices

Act.

WHEREFORE, Counterclaimant Deuerling respectfully demands that this Court award her

judgment in an amount to be proven at trial but no less than $1,000 for each violation of the Fair Debt

Collection Practices Act.

## COUNT III – Violation of the Fair Debt Collection Practices Act

139.     Paragraphs 1 through 138 are hereby incorporated by reference and are realleged as if

fully set forth again.

140.     As stated above, the United States is acting as a debt collector on behalf of JP Morgan

Chase N.A. (formerly INB National Bank).

141.     The United States hired several other collection agencies to assist it in collecting the

debt.

142.    The United States appointed the other debt collectors as its agent tasked with sending dunning letters to Deuerling.

143.    Deuerling properly notified the debt collectors repeatedly that the debt was in dispute and she requested the name and address of the original creditor.

144.    These disputes and requests were provided to agents of the United States, to wit, ConServe, Progressive Financial Services, Windham Professionals, Allied Interstate, Diversified Collection Services Inc., and others.

145.    The United States, knowing that the debts were disputed with each agency, continued to assign them to new agencies to conceal the dispute and evade the requirements of the Fair Debt Collection Practices Act.

146.    Nevertheless, neither the United States nor its agents listed above provided the name and address of the original creditor or any form of verification of the debt.

147.    The United States, in its capacity as a debt collector, failed to cease and desist and continued to attempt to collect the debt notwithstanding Deuerling's disputes.

148.    The actions of the United States willfully or negligently violated the Fair Debt Collection Practices Act.

149.    The violations of the Fair Debt Collection Practices Act damaged Deuerling.

AMENDED CROSS CLAIM AND THIRD PARTY COMPLAINTS

**Count IV– Contribution and Indemnification against JP Morgan Chase NA successor to INB National Bank, Education Management Corporation, Education Management LLC, Education Management Holdings LLC, and the Art Institute of Pittsburgh**

150.    Paragraphs 1 through 148 are hereby incorporated by reference and are fully realleged as if fully set forth again.

151.    All of the above practices, or similar practices, were in place during the time of the loan that was issued to Defendant.

152.    Defendant relied on misrepresentations of EDMC and the Third Party Defendants, including INB National Bank and the Art Institute of Pittsburgh, as to the benefits of the education.

153.    Defendant relied on misrepresentations of EDMC and the Third Party Defendants, including INB National Bank and the Art Institute of Pittsburgh, as to the jobs that she would be able to obtain with the education.

154.    Defendant relied of the false and misleading sales tactics of the conspirators.

155.    JPMorgan Chase N.A. is the successor in interest to INB National Bank.

156.    INB  National Bank was aware of EDMC's fraudulent schemes but, nevertheless, entered into programs with EDMC to issue guaranteed student loans.

157.    INB National Bank (sued as JP Morgan Chase N.A.), Education Management Corporation, Education Management LLC, Education Management Holdings LLC, and the Art Institute of Pittsburgh entered into a conspiracy to defraud the Defendant.

158.    If Defendant is liable to the United States for the loan which was the product of the fraud perpetrated upon her and the United States, she is entitled to judgment against INB National Bank (sued as JP Morgan Chase N.A.), Education Management Corporation, Education Management LLC, Education Management Holdings LLC, and the Art Institute of Pittsburgh for indemnification and contribution.

159.    Had INB National Bank (sued as JP Morgan Chase N.A.), Education Management Corporation, Education Management LLC, Education Management Holdings LLC, and the Art Institute of Pittsburgh not engaged in the fraudulent scheme, she would not be liable for any student loan.

160.    INB National Bank (sued as JP Morgan Chase N.A.), Education Management Corporation, Education Management LLC, Education Management Holdings LLC, and the Art Institute of Pittsburgh not engaged in the fraudulent scheme, Defendant would have obtained an education at a *bona fide* education institution and probably had a successful career that would have enabled her to

pay her financial obligations.

161.    However, due to the false representations of INB National Bank (sued as JP Morgan Chase

N.A.), Education Management Corporation, Education Management LLC, Education Management

Holdings LLC, and the Art Institute of Pittsburgh, Defendant was left with an education that did not

provide her with the opportunities to obtain gainful employment.

**COUNT V – for declaratory judgment and injunctive relief against G.C. Services L.P.,
Diversified Collection Services, Inc., Allied Interstate Inc., Windham Professionals Inc.,
Progressive Financial Services Inc., Continental Service Group Inc. a/k/a Conserve**

162.    Paragraphs 1 through 161 are hereby incorporated by reference and realleged as if fully set forth

again.

163.    Third-Party Defendants against G.C. Services L.P., Diversified Collection Services, Inc., Allied

Interstate Inc., Windham Professionals Inc., Progressive Financial Services Inc., Continental Service

Group Inc. a/k/a Conserve each have contacted Defendant and claimed that they owned the debt in

question.

164.    Third-Party Defendants asserted they were collection agencies entitled to payment for the debt.

165.    Third-Party Defendants demanded payment for the debt from the Defendant.

166.    If judgment is entered in favor of the United States, the Defendant may be subject to multiple

liability.

167.    A justiciable controversy exists as to whether against G.C. Services L.P., Diversified Collection

Services, Inc., Allied Interstate Inc., Windham Professionals Inc., Progressive Financial Services Inc.,

Continental Service Group Inc. a/k/a Conserve are owed any amount in connection with the debt that

Plaintiff sues for.

168.    Defendant is entitled to a declaration that she is not liable to the Third Party Defendants.

169.    Defendant is entitled to an injunction preventing Third Party Defendants from contacting her or

demanding payment for the debt.

170.    Pursuant to the Fair Debt Collection Practices Act, Defendant is entitled to an injunction

directing the Third Party Defendants to Cease and Desist from further collection activity.

**COUNT VI – Fair Debt Collection Practices Act Violations Against United States Department of Education, United States Department of Treasury, and United States Department of Justice**

171.     Paragraphs 1 through 170 are incorporated by reference and are realleged as if fully set forth again.

172.     This is not a suit claiming that officers and agents of the United States acted as "debt collectors," but that the agencies themselves acted as debt collectors.

173.     Third Party Defendants United States Department of Justice, United States Department of Treasury, and United States Department of Education have acted as a debt collector for INB National Bank and its assigns.

174.     Third Party Defendants have each mailed a demand notice to the Defendant over the past year.

175.     Third Party Defendants have each demanded that the Defendant pay the alleged debt owed to INB National Bank.

176.     Third Party Defendants' letters did not contain any notice that it was from a debt collector, that the debt could be disputed, or that the Defendant could request the name and address of the original creditor.

177.     As a result, the letters sent violate the Fair Debt Collection Practices Act.

178.     Third Party Defendants United States Department of Education, United States Department of the Treasury, and the United States Department of Justice are each liable to the Defendant for an amount to be proven at trial, but no less than $1,000.00.

**COUNT VII – Privacy Act Accounting Violations Against United States Department of Education**

179.     Paragraph 1 through 178 are incorporated by reference and are realleged as if fully set forth again.Third Party Defendant United States Department of Education is a federal agency governed by the Privacy Act of 1974.Each agency, **with respect to each system of records under its control,**

must keep a record of the date, nature, and purpose of each disclosure of a record to any person or to another agency under subsection (b) and the name and address of the person or agency to whom the disclosure is made. See 5 U.S.C. § 552a(c)(1). This accounting of disclosures must be kept for five years or the life of the record, whichever is longer, after the disclosure for which the accounting is made. See 5 U.S.C. § 552a(c)(2).

180.    The Department of Education willfully and knowingly failed to keep an accounting of its disclosures regarding Defendant's purported loans.

181.    The Department of Education released information to the United States Department of Justice, but did not keep an accounting of its disclosure.

182.    The Department of Education released information to the United States Department of the Treasury, but did not keep an accounting of its disclosure.

183.    The Department of Educations released information to G.C. Services L.P., but did not keep an accounting of its disclosure.

184.    The Department of Education released information to Diversified Collection Services Inc., but did not keep an accounting of its disclosure.

185.    The Department of Education released information to Allied Interstate Inc., but did not keep an accounting of the disclosures.

186.    The Department of Education  released information to Windham Professionals Inc., but did not keep an accounting of the disclosures.

187.    The Department of Education released information to Progressive Financial Services Inc., but did not keep an accounting of the disclosures.

188.    The Department of Education released information to Continental Service Group Inc. a/k/a Conserve, but did not keep an accounting of the disclosures.

189.    The Department of Education released information to KML Law Group P.C. and Thomas I. Pulco, but did not keep an accounting of the disclosures.

190.    The disclosures involved sensitive personal information, financial information, and confidential data.

191.    The failure to keep an accounting of the disclosures was harmful to Defendant because it impeded her ability to defend against the stale claims of the Plaintiff, resulted in multiple collection agencies harassing her, resulted in a scheme to violate the Fair Debt Collection Practices Act, and caused complete chaos and confusion as to whom the student loan was due.

192.    The information that the United States Department of Education disclosed included, but is not limited to, Deuerling's name, applications for loans, Social Security number, home address, telephone, marital status, financial transactions and history, allegations of debts being owed, payment histories, educational records, records that occurred or were made while Deuerling was a minor, and other information contained within her files.

193.    The above allegations are based on information received from the collection agencies which, during the dispute process, advised that the claims against her were assigned via an automated mechanism without oversight.

194.    Deuerling was harmed in that she was harassed by multiple collection agencies even though they were served with cease and desist notices, new agencies came into the picture.  The failure to maintain an accounting also harmed Deuerling because, had an accounting been maintained, it is unlikely that the agency would have assigned the debt to multiple agencies knowing that the case was disputed.

195.    The actions of the Department of Education were willful as it is built into their system of harassment to assign multiple collection agencies, without accounting or oversight, to attempt to badger, harass, intimidate, and cause emotional distress to persons who owe student loans.

196.    The Department of Education's action caused emotional distress to Deuerling including panic, restlessness, and other emotional trauma.

197.    Deuerling had to exhaust money sending cease and desist letters to multiple collection agencies

because of the Department of Education's lack of oversight and discombobulated system that resulted in tens of agencies contacting Deuerling to collect the debt when the Department of Education had no oversight, did not provide accurate information to the agencies, and did not maintain an accounting system.

198.    As a result of the willful and intentional violations of the Privacy Act, the Defendant is entitled to $1,000 for each of the enumerated violations of the accounting provisions of the Privacy Act.

199.    Even if Deuerling is not entitled to damages, she is entitled to an injunction requiring the Department of Education to establish an accounting system as required by the Privacy Act because, regardless of whether the agency prevails and obtains judgment, it will continue to have more collection agencies harass Deuerling.

**COUNT VIII – Violations of the Fair Debt Collection Practices Act against Thomas I. Pulco and KML Law Group, P.C.**

200.    Paragraphs 1 through 199 are hereby incorporated by reference and are realleged as if fully set forth again.

201.    Thomas I. Pulco ("Pulco") and KML Law Group P.C. ("KML") are debt collectors and are engaged in the practice of debt collection law.

202.    Pulco and KML sent communications to Defendant relating to a debt purportedly owed INB National Bank and its assign, the United States Department of Education.

203.    Pulco and KML did not indicate in their mailing that they were acting as a debt collector.

204.    Pulco and KML did not indicate in the communication that the Defendant maintained a right to dispute the debt, to request the name and address of the original creditor, or obtain verification of the debt.

205.    As a result of the violations of the Fair Debt Collection Practices Act, Defendant was damaged.

WHEREFORE, Defendant demands that: (1) Damages in an amount of $1,000 or more be granted against third party defendants United States Department of Justice, United States Department of Education, and United States Department of the Treasury for violations of the Fair Debt Collection Practices Act; (2) That this Court declare that United States Department of Justice, United States Department of Education, and United States Department of Treasury acted as a debt collector; (3) Damages in the amount of $1,000 or more be awarded against United States Department of Education for each disclosure that it did not account for; (4) That United States Department of Education be enjoined to retain proper disclosures and to recreate a log of disclosures that occurred with respect to Defendant; (5) That judgment be awarded in an amount in excess of $1,000 against Thomas I Pulco and KML Law Group P.C.; (6) That a declaration be issued that Thomas I Pulco and KML Law Group P.C. are acting as debt collectors and must comply with the Fair Debt Collection Practices Act; (7) That this Court discharge the Defendant as to any liability to the Third Party collection agency defendants and declare that nothing is due them and that they be forever restrained from attempting to collect the debt that is the subject of this action; and (8) that, if the United States prevails on its breach of contract action against Defendant, the Third Party Complaints be liable in an equal amount to Defendant for contribution and indemnification.

Respectfully submitted,

_____*/s/ Melissa Deuerling*_____
Melissa Deuerling

CERTIFICATE OF SERVICE

I, Melissa Deuerling, certify that on November 9, 2015, each party that appeared in this action was served with this pleading via the Court's ECF system.  Each non-appearing party will be served in the near future with a Summons that is to be issued by the Clerk directing an Answer to the Third Party Complaint.

*/s/ Melissa Deuerling*
Melissa Deuerling